IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA          )
                                  )
          v.               )  CRIMINAL NO. 02-29 ERIE                    )
JAMES FOWERS               )


RE-SENTENCING
_____


Proceedings held before the HONORABLE
SEAN J. McLAUGHLIN, U.S. District Judge,
in Courtroom C, U.S. Courthouse, Erie,
Pennsylvania, on Thursday, July 7, 2005.


APPEARANCES:
_____
          CHRISTIAN A. TRABOLD, Assistant United States
Attorney, appearing on behalf of the Government.
          TIMOTHY J. LUCAS, Esquire, appearing on behalf                of the
Defendant.


Ronald J. Bench, RMR - Official Court Reporter

2

1                    I N D E X
                     − − − − −

2

3     WITNESS:              DIRECT  CROSS  REDIRECT  RECROSS

4

5  FOR THE DEFENSE:

6  Diana Baideme -           4     12     18     20
7  James Fowers -           20     26     --     --
8

9

10                 - - -

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1              P R O C E E D I N G S

               _ _ _ _ _ _ _ _ _ _

2

3          (Whereupon, the re-sentencing proceedings began at
4    1:28 p.m., on Thursday, July 7, 2005, in Courtroom C.)
5

6          THE COURT:  All right, this is the time we set for
7    re-sentencing in the case of United States of America versus
8    James Fowers.  Mr. Lucas, is there going to be any additional
9    testimony or anything?

10         MR. LUCAS:  There is, your Honor.
11         THE COURT:  Of what nature?

12         MR. LUCAS:  Your Honor, I have a witness, Diana
13   Baideme, B-a-i-d-e-m-e, who has specific knowledge about two
14   things, judge.  One is, if the court will recall from the last
15   sentencing proceeding, there was what was a then permissible
16   two-level increase for obstruction based on a conversation Mr.
17   Fowers supposedly had with his son, Cody.

18         THE COURT:  Right.

19         MR. LUCAS:  She has some specific knowledge about
20   that.  And about conversations that she had with Cody about the
21   same matter that predate the alleged time when Mr. Fowers had
22   the conversation.

23         THE COURT:  So this is relative to 3C1.1 obstruction
24   enhancement?

25         MR. LUCAS:  It is, judge.  And then in addition to

4

1   that, she also has testimony about conversations that she had
2   with Mr. Fowers' wife at the time, Paula, that will shed some
3   light on the whole obstruction issue.  And she has some
4   firsthand knowledge, I guess to an ancillary matter, as to her
5   direct knowledge of Cody, as well as the other children, just
6   to flush it out, as to their abilities on the computer.
7       THE COURT:  All right.  Do you have anything else
8   beyond that?

9       MR. LUCAS:  Mr. Fowers, your Honor.
10      THE COURT:  Mr. Trabold, does the government have
11  anything?

12      MR. TRABOLD:  No.

13      THE COURT:  All right, let's go.
14      MR. LUCAS:  Okay.

15      THE COURT:  Ma'am, come on up here, give your name
16  to my court reporter and I'll swear you in.
17      THE WITNESS:  Diana Baideme.  D-i-a-n-a,
18  B-a-i-d-e-m-e.

19      DIANA BAIDEME, DEFENSE WITNESS, SWORN
20              DIRECT EXAMINATION

21  BY MR. LUCAS:

22  Q.   Ma'am, would you begin by again restating your name for
23  the record?

24  A.   Diana Baideme.

25  Q.   And do you know James Fowers?

5

1   A.   Yes, I do.

2   Q.   How long have you known Mr. Fowers?

3   A.   About 10 years.

4   Q.   And did you also know Paula Fowers?

5   A.   Yes, I did.

6   Q.   And how long had you known Paula?

7   A.   About 10 years, also.

8   Q.   Where were you living and where were they living at the
9   times that are relevant to this whole criminal involvement?
10   A.   We both lived in Cambridge Springs.

11   Q.   Okay.  And how often during this relevant time period,
12   that is the time period from when the criminal investigation
13   ultimately took place and then charges were filed, how often
14   would you see James Fowers?

15   A.   Pretty much daily.

16   Q.   And what about Paula Fowers?

17   A.   Daily.

18   Q.   In addition to knowing Paula Fowers and James Fowers, did
19   you also know their children?

20   A.   Yes.

21   Q.   And can you state for the record the names of the
22   children and, if you can recall, their ages at the time of
23   these incidents?

24   A.   Cody --

25        THE COURT:  Keep your voice up, please.

6

1       THE WITNESS:  Sorry.  Truthfully right now I can't
2  do names.

3  BY MR. LUCAS:

4  Q.    Okay.  Do you know how many children?
5  A.    Three.

6  Q.    Three children.  With regard to Cody, do you have a
7  recollection as to how old he would have been at the time these
8  things occurred?

9  A.    He was probably about 10-years-old.

10  Q.    And when you say that you had almost daily contact or
11  interaction with James and Paula, how often would you have
12  contact as well with the children?

13  A.    That was on a daily basis.

14  Q.    What would cause you to have contact with the Fowers'
15  family on an almost daily basis?

16  A.    We lived -- not even a block away, we were very close
17  friends.  Their kids played with my kids daily.  Like I said,
18  we were just very close friends.

19  Q.    Are you married?

20  A.    Yes.

21  Q.    To whom are you married?

22  A.    Mark Baideme.

23  Q.    Do you have children as well?

24  A.    Yes.

25  Q.    And how old are your children?

7

1  A.    My oldest right now is 16, 13, and a four-year-old
2  daughter.

3  Q.    And were your children, relatively speaking, the same
4  general ages at the Fowers' children?

5  A.    Yes.

6  Q.    With regard to the criminal investigation and the
7  subsequent charges, did there come a time when you became aware
8  that Mr. Fowers was being investigated and subsequently charged
9  with the crimes that bring us to court here today?
10  A.    Yes.

11  Q.    With regard to the time that he was incarcerated, do you
12  recall that?

13  A.    Yes.

14  Q.    And do recall where he was incarcerated?
15  A.    Where?

16  Q.    Yes.

17  A.    At the jail up here.

18  Q.    In Erie?

19  A.    Yes.

20  Q.    Erie County jail?

21  A.    Yes.

22  Q.    All right.  Relative to that timeframe, that is the time
23  that Mr. Fowers was incarcerated, do you recall having any
24  conversations with first Cody relative to these criminal
25  incidents?

8

1  A.   Yes.

2  Q.   What can you advise the court as to -- first of all,
3  where did the conversations occur?

4  A.   It occurred at Jim Fowers' home.  It was in their kitchen
5  with Cody and his mother.  We were talking about -- Cody was
6  very upset, he was discussing that he did something wrong and
7  he wanted to talk about it.  And we were saying, he said that
8  he did it, and we were like what did you do.  He said he did
9  something wrong on the computer, that that's why his daddy went
10  away.  And we said, okay, well, we don't want you to discuss it
11  with us right at this moment.  Because we don't want you to
12  tell us anything right now because we don't want to make the
13  mistake of you telling us something and us making it sound like
14  we're telling you what you did.  We want you to tell somebody,
15  like a lawyer, of what you did.  And I talked to Paula, and
16  told Paula the same thing, right while we were sitting at the
17  table.  I said, Paula, this is something that I need to do.
18  I don't want you to discuss it with him.  Because I don't want
19  you to sit there and make it sound like you're going through it
20  with him step by step.  Because he's going to have to remember
21  it on his own.  I don't want you sitting there talking with him
22  and saying how did you do this, and go through it with him.
23  Because then it sounds like you're making it up with him.
24  Q.   All right.  Do you have any recollection, either in terms
25  of sequence or date, as to when it was that you had this

9

1  conversation with Cody and Paula?

2  A.    This just happened probably three days after -- I think
3  it was like three days after Jim had been taken.
4  Q.    To prison?

5  A.    Yes.

6  Q.    Okay.  Based on the conversation that you had with Cody
7  that he had done something wrong on the computer, did there
8  come a time that you personally participated in having Cody
9  relay that information to any person in law enforcement or
10  anyone representing Mr. Fowers at the time?
11  A.    There was two times that we had taken Cody to two
12  different lawyers --

13  Q.    When you say we, who is we?

14  A.    Me and Paula.  There was a lawyer that was provided by
15  the courts, we took him to one lawyer, and they said they
16  wouldn't have him testify at all.  Not to even bring it up
17  because he's just a kid, they wouldn't believe a kid.  And then
18  there was another lawyer that was hired, and he was right
19  across the street from the jail -- that was recently hired
20  after that other lawyer.

21  Q.    Okay.

22  A.    We went there and he also heard the testimony from Cody
23  then.

24  Q.    And the something wrong that Cody indicated to you in the
25  kitchen three days after Mr. Fowers was incarcerated, what was

10

1 that, if you know?

2 A.   He said that he did something wrong on the computer and
3 was looking stuff up that he wasn't supposed to be looking up.
4 Q.   All right.  With regard to -- let me back up.  In being
5 in the Fowers' household and having children there the same
6 age, were there times when you observed the Fowers' children,
7 and then specifically Cody, and their facility or their
8 abilities on the computer?

9 A.   Oh, yeah, these children are very bright.  All the way
10 from Steve down to Cody.  They could do just about anything on
11 the computer.  I watched them take apart computers and rebuild
12 the computers.  Cody was able to get in with using -- breakdown
13 the computer and be able to get on any sites that he was
14 wanting to get on to.  He was able to -- he could do anything
15 any adult at the time could do on a computer.
16 Q.  Cody?

17 A.  Cody, yes.

18 Q.   And you witnessed him do those things when he was age 10
19 or 11 at the time of these incidents?

20 A.   Yes.  I couldn't do the things that he could do.  In
21 fact, he would come down and he would do things on my computer
22 because I couldn't do them.

23 Q.   Did there come a time as well when you had a conversation
24 with Paula Fowers?

25 A.   I've had several conversations with Paula.

11

1  Q.   As relevant to this inquiry, ma'am, what can you advise
2  the court?

3  A.   I had several conversations with Paula with this.  Paula
4  at a couple points, she was very upset because this was taking
5  a large toll on Cody because -- he knows that he did something
6  wrong and she also -- she had told me that she was going to
7  make Jim decide to take the fall instead of Cody.  She told him
8  that she wasn't going to have Cody go through it anymore.  And
9  she was going to have Jim say that he was going to have do it
10 instead.  She decided that she was going to disconnect the
11 phone several times, and she just wasn't going to deal with any
12 more of this.  She just changed her mind on a lot of this stuff
13 the way that she just wanted it to be done, that she wasn't
14 going to deal with it.

15 Q.   Did she give you any indication as to whether she
16 communicated any of that to Mr. Fowers?

17 A.   Sometimes she gave me an indication that she said the
18 stuff, and then sometimes she didn't.  Because I know there was
19 a lot of times she would lie about it to me.  There's a lot of
20 times I know that he tried to communicate with her by writing
21 her letters and she wouldn't open them, she threw them in the
22 garbage and wouldn't even read them.  So she said that she told
23 him sometimes and sometimes she didn't.

24       MR. LUCAS:  That's all I have, your Honor.
25       THE COURT:  Okay.  Do you have any cross, Mr.

12

1  Trabold?

2          MR. TRABOLD:  Yes, your Honor.

3                  CROSS-EXAMINATION

4  BY MR. TRABOLD:

5  Q.   Ma'am, where were you the last time Mr. Fowers got
6  sentenced, didn't you have this information before?
7  A.   Sometimes I got information, sometimes I didn't.
8  Q.   Okay.  But you knew all of this information supposedly
9  prior to the last time Mr. Fowers got sentenced, correct?
10  A.   Every time I was able to be here that I knew about it, I
11  was here.  I was here at the one sentencing that he had, I was
12  here otherwise.

13  Q.   So the last time Mr. Fowers got sentenced you were here?
14  A.   No, the one time that I was here, the last time I was
15  able to be here -- that was it.  I wasn't told about the last
16  time he was sentenced.

17  Q.   He was only sentenced once, so were you here or not here
18  when he got sentenced?

19  A.   I wasn't here the time he got sentenced, no.
20  Q.   Were you here or not here at the time that he pled guilty
21  to the offenses?

22  A.   I was only here once, I don't know what time that was
23  considered.

24  Q.   Did you, prior to today, did you feel the need or the
25  compulsion to share your information with anybody in law

13

1  enforcement or send a letter to the judge or do anything like
2  that?

3  A.   I have sent several things to Jim, I have written several
4  things down and I told several lawyers, yes.
5  Q.   Okay.  And the one lawyer you told this information to
6  was the Federal Public Defender, Tom Patton, correct?
7  A.   If that's who the name was.

8  Q.   It was the federal defender, Mr. Fowers' appointed
9  counsel?

10  A.   Okay.

11  Q.   Is that accurate, did you even know the person's name?
12  A.   It would have been the lawyer that was across the street
13  from the jail at the time.

14  Q.   And he told you that he didn't find the information from
15  Cody to be credible, correct?

16  A.   No, that's not the one, no.  This would be the one that
17  was across the street from the jail at the time, the one that
18  had been hired for him -- that is who I gave all the
19  information to.

20  Q.   And that attorney told you that he didn't think Cody's
21  information was credible?

22  A.   No, that would not have been the one, no, that was the
23  first one.

24  Q.   So you took him to the first attorney, the appointed
25  attorney, not the attorney that had his office across from the

14

1  jail?

2  A.   Right.

3  Q.   That attorney interviewed Cody, heard the information and
4  indicated to you he didn't think Cody's information was
5  credible, correct?

6  A.   Correct.

7  Q.   And then you took him to the next attorney, whose office
8  was across from the jail?

9  A.   Correct.

10  Q.   And that attorney heard what Cody had to say and nothing
11  came of it?

12  A.   Correct.

13  Q.   You didn't think to inform anybody of this information?
14  A.   That was going on with Paula and the attorney and with
15  Jim.

16  Q.   After Mr. Fowers was sentenced, you still didn't inform
17  anybody about the information you had, correct?
18  A.   I was working with, talking with Jim and they were
19  working with the attorneys.

20  Q.   Well, didn't you think, according to the information
21  you're providing, that an injustice had been committed, that
22  you needed to provide information to the court about or
23  somebody in law enforcement about; didn't it occur to you to
24  tell somebody other than Jim the information you had?
25  A.   I assumed that the attorneys were doing their job.

15

1  Q.   Even though the previous two attorneys didn't find the
2  information that you provided to be credible?
3  A.   I assumed that all the information we were giving them
4  was getting put into the system the appropriate way, that
5  everything that I had said was being taken as part of the
6  testimony.

7  Q.   What are Mr. Fowers's children names?
8  A.   For some reason I can't think of the middle child's name
9  right now.  But the oldest is Steve, the youngest is Cody.
10  Q.   You saw them on a daily basis for how long?
11  A.   For about 10 years.

12  Q.   And this conversation when Cody told you that he did
13  something wrong, when did that occur?

14  A.   About three days after.

15  Q.   Three days after what?

16  A.   Jim had been taken away.

17  Q.   And you instructed him and Mr. Fowers's then wife, you
18  said we don't want to hear any more information about what
19  you're telling us?

20  A.   Correct.

21  Q.   And the reason you did that is what?

22  A.   Because I didn't want anything to be obstructed by what
23  he said.  To be put into his mind that we were trying to change
24  anything.

25  Q.   So you then took him to the police station so he could

16

1  tell the police all the information he had?
2  A.   No.

3  Q.   You didn't do anything with the information then?
4  A.   No, Paula took him and I took him to the lawyer -- she
5  had him talk to the lawyer about it.

6  Q.   Did you call Children's Services and let them know that
7  there was a 10 or 11-year-old who perhaps was looking at child
8  pornography and that was a concern to you?

9  A.   We didn't think of it as being wrong as a child looking
10  at child pornography, we thought of it as a child being -- a
11  child wanting to see other bodies.

12  Q.   Let me see if I have this straight.  You didn't think
13  that there was a problem with a 10 or 11-year-old saying he was
14  viewing child pornography on the computer?

15  A.   A child wanting to be curious, no.

16  Q.   A child wanting to be curious about child pornography?
17  A.   With having older brothers around that are at the ages of
18  curiosity, who are going through puberty, wanting to see other
19  nude bodies and possibly of children of their own age, no.
20  Q.   Let me see if I have this straight.  You don't think
21  there's anything wrong with a 10 or 11-year-old getting on the
22  Internet and looking at either adult or child pornography,
23  that's curiosity to you?

24  A.   Whenever another child walks around and says, and you
25  have another little child around and -- they are curious about

17

1  another little body of their own, as little kids, you don't sit
2  there and scold them because they're curious about the other
3  child walking around.  Another child like that, I don't.
4  Q.   Just so we're clear, you don't think there's anything
5  wrong with a 10 or 11-year-old looking at either adult or child
6  pornography on the Internet; you just classify it as curiosity?
7  A.   I'm not thinking of it as pornography, I'm thinking of it
8  as curiosity.  I'm not thinking of it as them looking for
9  pornography.  Pornography is wrong.  Curiosity is different.
10  Q.   What are they looking at, though, they're not looking as
11  curiosity, they're looking at pornography --
12         THE COURT:  Mr. Trabold, move on.
13  BY MR. TRABOLD:

14  Q.   So you didn't notify anybody, he told you the information
15  or at least alluded to some of the information, did it occur to
16  you that perhaps there was a problem with Jim or Paula's
17  supervision of him?

18  A.   I don't think there was anything wrong with their
19  supervision.  These were very well behaved kids, very
20  intelligent children.

21  Q.   Who just happened to be on the Internet looking at
22  pornography?

23  A.   They were kids.

24  Q.   So in an effort not to have him explain to you what
25  happened, you told him not to tell you anything further and you

18

1 took him to an attorney?

2 A.   Which we thought was appropriate because we did not want
3 to tamper with what he may know.

4 Q.   As you sit here today, are you aware that Cody was
5 interviewed by the Huntsville, Alabama Police Department and
6 told them in an extensive interview that Jim put him up to
7 saying all that information and put all the ideas into his mind
8 and told him to take responsibility for it; did you know that?
9 A.   I could believe that, yes.

10 Q.   So you don't have any dispute with the fact that Cody
11 told the police that Jim put him up to it?

12 A.   I can believe that.

13      MR. TRABOLD:  Nothing further, your Honor.
14      THE COURT:  Anything else?

15      MR. LUCAS:  Yes, your Honor.

16           REDIRECT EXAMINATION

17 BY MR. LUCAS:

18 Q.   I'm a little unclear with regard to your answer.  You an
19 believe what, that Jim put Cody up to it or that Cody would say
20 that?

21 A.   I can believe that Cody would say that.
22 Q.   Why?

23 A.   Because Cody could be persuaded to do a lot of things and
24 whoever he's in the care of.  He does not want to hurt anyone's
25 feelings.  And right now with him being under the care of his

19

1  mother, I could see him not wanting to hurt her feelings.  And
2  his mother can control him very well on what he might want to
3  say.  And I could see him, especially being under her care, not
4  wanting to go against her.

5  Q.    One last thing about Mr. Trabold's questioning with
6  regard to when it was.  This isn't the first time that you have
7  told people involved in this case the same thing that you
8  testified to Judge McLaughlin about here today, correct?
9  A.    Correct.

10  Q.    You told, and for whatever reasons, you told the first
11  attorney that was involved in Mr. Fowers' case, is that what
12  your testimony was?

13  A.    Yes.

14  Q.    Do you also recall giving a statement to the investigator
15  from the Federal Public Defender's office, a Mr. Buckshaw?
16  A.    Yes.

17  Q.    Did you tell him the same thing?

18  A.    Yes.

19  Q.    Did you tell Mr. Fowers' second attorney by third person,
20  Mr. Hudak?

21  A.    Yes.

22  Q.    That would be the lawyer across from the jail, did you
23  tell him the same thing as you said today?

24  A.    Yes.

25          MR. LUCAS:  That's all.

20

1        THE COURT:  Anything else?

2        MR. TRABOLD:  Briefly, your Honor.
3            RECROSS-EXAMINATION

4   BY MR. TRABOLD:

5   Q.   So Cody is easily persuaded then?

6   A.   Yes.

7   Q.   And he could have been easily persuaded by his father to
8   take responsibility for the pornography?

9   A.   If he had been.

10       MR. TRABOLD:  Nothing further, your Honor.
11       THE COURT:  Thank you, ma'am, you're excused.
12       MR. LUCAS:  Mr. Fowers.

13       THE COURT:  Before we start, would you spell the
14   lady's name who was just on the stand?

15       MR. LUCAS:  Yes, your Honor.  D-i-a-n-a,
16   B-a-i-d-e-m-e, Diana Baideme.

17       THE COURT:  Thank you, ago ahead.
18        JAMES FOWERS, DEFENDANT HEREIN, SWORN
19            DIRECT EXAMINATION

20   BY MR. LUCAS:

21   Q.   Mr. Fowers, can you state your name for the record,
22   please?

23   A.   James Oliver Fowers.

24   Q.   Where are you currently housed?

25   A.   Right now in the Erie County Prison.

21

1  Q.    And prior to being transferred to the Erie County Prison?
2  A.    The Federal Medical Center in Devens, Massachusetts.
3  It's a federal prison.

4  Q.    You may need to move that microphone just a little bit
5  closer in order for you to be heard.  At some point in time,
6  were you arrested for the criminal offenses for which you are
7  serving a sentence?

8  A.    Yes, sir.

9  Q.    As result of your arrest, where were you initially
10  incarcerated?

11  A.    Erie County Prison.

12  Q.    Do you remember the date that you would have been
13  arrested?

14  A.    August 29, 2002.

15  Q.    Once you were housed at the Erie County Prison, do you
16  recall approximately when it would have been that you would had
17  any contact with anyone in your family?

18  A.    I was unable to contact anybody because my phone didn't
19  accept long distance or collect calls for at least a week, week
20  and a half.

21  Q.    At some point, obviously, you were able to make collect
22  calls?

23  A.    Yes, sir.

24  Q.    And were you aware at the time, then, as well as the time
25  now, that financial arrangements have to be made with the Erie

22

1  County Prison in order to be able to make phone calls out of
2  the prison?

3  A.   Yes, sir, yes, I was.

4  Q.   And is it your recollection that those arrangements had
5  not been made and were not able to be made within the first
6  three days or so of your initial incarceration?
7  A.   Yes, sir, I was, because it wouldn't go through, it would
8  say you can't make that phone call.

9  Q.   With regard to the allegations, Mr. Fowers, as to your
10  coercion of your son, Cody, what can you advise the court with
11  regard to any conversations you had with Cody about the matters
12  that were under investigation that resulted in your charges and
13  whether there were any efforts on your part to coerce him to
14  supposedly take responsibility for those actions?
15  A.   Yeah -- basically, I was informed by Mr. Yoder from Hudak
16  Law Office that Cody, you know, had said that he was
17  responsible for this, they wouldn't give me a whole lot of
18  detail.  He did say Cody did give him a taped confession or
19  whatever.

20        THE COURT:  Who was the man who said this?
21        THE WITNESS:  Mr. Yoder, he was a member of Mr.
22  Hudak's law office.

23        THE COURT:  All right, go ahead.
24        THE WITNESS:  He came to the Erie County Prison and
25  told me, because I didn't want to release Cody's name or his

23

1   statement at the beginning of all this because I didn't want
2   Cody involved, okay.  Mr. Yoder told me that Cody came to him
3   and gave him a full statement of what he did, to include a
4   piece of paper that he, Cody, had given Mr. Yoder.  To this day
5   I've never seen this piece of paper, it was in Mr. Haft's
6   possession.  I've tried several times to get this piece of
7   paper, but from what I was told by Mr. Yoder, is it very
8   specific of what Cody was doing on the Internet.
9   BY MR. LUCAS:

10  Q.    Without testifying as to any specific knowledge of what
11  that was because, obviously, you couldn't know that.  Generally
12  speaking, can you advise the court and for the record of Cody's
13  abilities on the computer and, without specifics, your other
14  two children as well?

15  A.    My sons were all very adept at building computers, going
16  through computers.  I've been dealing with computers since long
17  before windows ever came out, and my kids and I were very
18  close, I treated my kids like friends more than anything else
19  in the world, you know what I'm saying.  And they were very
20  curious at an early age.  Because of the way that computers
21  were going, I started them on computers at a very young age.
22  Q.    What are the names of your other children and what are
23  their ages?

24  A.    Steven would be 17, Chris would be 16, Cody's got to be
25  14 now.

24

1 Q.   In terms of his specific abilities, Cody, back when he
2 was 10, 11-years-old, what kinds of things was he capable of
3 doing with a computer and on a computer?

4 A.   Cody way back then could actually do a format on a
5 computer.  Which basically is erasing the computer and
6 reloading windows or whatever operating system it was at the
7 time.  He was very able to do that.  He could download music.
8 He was very capable of getting around the Internet very well,
9 too.

10 Q.   Specifically, with regard to the claim by the government
11 that you were the one that attempted to coerce Cody into
12 accepting responsibility for this, what can you tell Judge
13 McLaughlin about that?

14 A.   I'm not sure I understand but --

15 Q.   The allegation that was made against you in your former
16 sentencing and the allegation that the government says is that
17 you attempted to obstruct justice by convincing your son, Cody,
18 to take responsibility and/or provide information to the
19 government that it was he and not you that was responsible for
20 the criminal acts to which you ultimately entered a plea of
21 guilty?

22 A.   Okay.  Basically, for the information that I'm told that
23 Cody had -- first of all, Cody went down and talked to Public
24 Defender, Thomas W. Patton, before I ever talked to him or
25 anybody else.

25

1  Q.   Let's slow down there.  In terms of the sequence of
2  events, I don't know if you can state dates, but at least with
3  regard to your knowledge as to the timing --
4  A.   This was within days after I was arrested.  We're talking
5  two or three days after I was arrested, Cody, from what I was
6  told, went down and talked to Mr. Patton.  Because when I first
7  talked to him, I did finally get to talk with Cody, actually I
8  talked to my wife on the phone.  The first time, first couple
9  times I did make contact, I did not talk to the kids.  But I
10  was informed by Paula that she and Diana had Cody down to Mr.
11  Patton's, and Cody had said he was responsible for that site.
12  Q.   In terms of that recollection, what I understand you to
13  be saying is is that prior to any conversation with Cody after
14  you were arrested, that Cody would have spoken to Mr. Patton
15  the time that the former witness, the prior witness indicated
16  that they were at Mr. Patton's office?

17  A.   Yes.

18  Q.   You had not spoken to Cody by that time at all about any
19  matters?

20  A.   No, sir.

21  Q.   All right.  When do you recall that you would have been
22  able to speak by phone from the Erie County Prison to your
23  children, and specifically to Cody, in terms of days or weeks
24  after your incarceration?

25  A.   It seems to me, from what I can recall, it was at least

26

1  two weeks after I was arrested that I had actually got to talk
2  to all three of my sons.

3  Q.   As to that issue only, Mr. Fowers, that is the issue with
4  regard to the claim of coercion, is there anything else that
5  you wanted to advise the court, this is your re-sentencing
6  proceeding, anything he needs to know about that issue,
7  anything else with regard to the issue involving Cody?
8  A.   No, I don't believe so right now.

9  Q.   There are other matters, with regard to your sentencing
10  proceeding generally, there are other matters that you did want
11  to be able to speak here in court or testify to Judge
12  McLaughlin about?

13  A.   Yes, I had a statement that I wanted to read to the court
14  if I could.

15       THE COURT:  He can do it now, is this something
16  that -- is this his allocution?

17       MR. LUCAS:  It is, your Honor.

18       THE COURT:  I'll take it at the appropriate time, he
19  doesn't have to do it now, you can do it later in the
20  proceeding, Mr. Fowers.

21       MR. LUCAS:  All right.

22       THE WITNESS:  Thank you, sir.

23            CROSS-EXAMINATION

24  BY MR. TRABOLD:

25  Q.   Mr. Fowers, you confessed to the offense when the FBI

27

1  came and interviewed you, correct?

2  A.  I'm sorry, I couldn't hear the first part of that.
3  Q.    When the FBI came to your house the first time and you
4  provided the hard drive, you told the FBI that you were going
5  to child pornography Web sites?

6  A.    No, sir, I did not.

7  Q.    You never said any of that?

8  A.    No, sir, I did not.  I said I was aware the computer had
9  been used for inappropriate things.  And from that it went on,
10  and I understand I signed a statement, and at the bottom of it,
11  FBI agent, I forget his name now --

12  Q.    Shawn VanSlyke?

13  A.    Yes, sir.  Had wrote something down on the bottom.  I
14  told him I did not want to sign anything because I did not want
15  to give up my rights for nothing.  So he said I'll write this
16  down saying on the bottom of that form saying that I knew the
17  computer was used for inappropriate stuff.  I'm not -- I wasn't
18  aware of that, obviously, okay.  Now, I didn't look at this
19  paper, I signed it, I initialed it, I was an idiot.  I was
20  scared to death when he came out.  When the FBI came out to my
21  house, sir, first of all, they came out to my work, I took them
22  to my home to prove this -- I gave them everything.  I took
23  them through every inch of my home, showed them anything, I
24  wasn't trying to hide anything.

25  Q.    And then you pled guilty, right?

28

1  A.   Yes, sir, I did.

2  Q.   Okay.  And during the guilty plea, you agreed with my
3  statement of the evidence, correct, other then the exception
4  that you made?

5  A.   No, sir, I did not.  As a matter of fact, at one point
6  during that change of plea, which was on the date of my
7  sentencing, excuse me, I don't mean the sentencing, on the
8  morning that I was supposed to go to trial, I changed my plea.
9  Okay.  At that time, halfway through the plea, I told Mr. Haft,
10  who was there at the time, who wasn't even my attorney, by the
11  way, he was from Mr. Hudak's office, but he was not my
12  attorney.  I told him this needs to stop, this is wrong, we
13  need to stop this.  And he shrugged his shoulders, and we just
14  went on.

15  Q.   And you didn't stop it, though?

16  A.   No, sir, I did not because I didn't know what to do.  I
17  mean, I'm very intimidated by coming, you know, when I walk
18  into a federal court and it's the United States of America
19  versus me, that scares me just a bit.

20  Q.   During the course of your plea, though, you told the
21  judge, yes, you were guilty, you didn't stop the plea at no
22  time, did you tell the judge I don't want to plead guilty?
23  A.   No, sir.

24  Q.   At no time did you refuse to plead guilty?
25  A.   The reason being, Mr. Haft, Mr. Yoder, both told me that

29

1  I was not allowed to address the court without going through my
2  attorney, my counsel at the time.  I was told that I was not
3  allowed to approach or talk to the judge, period.
4  Q.    So all of this is just you being railroaded by a series
5  of different attorneys?

6  A.    Yes, to a point, yes.

7        MR. TRABOLD:  Nothing further, your Honor.
8        THE COURT:   Anything else?

9        MR. LUCAS:  Only with regard to the allocution.
10        THE COURT: He can do that later.  All right, Mr.
11  Fowers, you can step down.  All right, the first thing I'm
12  going to do, before we get to the sentencing aspect,
13  notwithstanding the fact that we are now in a post-Booker world
14  where the guidelines are advisory, I, nevertheless, have to
15  establish the advisory guideline range.  And let the record
16  also reflect, and I presume it was the intention of the
17  government to do so, that all of the evidence that was offered
18  at the previous sentencing applies here as well, is that right?
19        MR. TRABOLD:  We would ask that you incorporate that
20  into this sentencing, your Honor.

21        THE COURT:  It is.

22        MR. TRABOLD:  Thank you.

23        THE COURT:  All right.  By way of background, at the
24  previous sentence I initially concluded, for reasons that were
25  previously set forth in the sentencing transcript at pages six

30

1   and seven, that a one-point reduction pursuant to Sentencing
2   Guideline 3E1.1(b)(1); and a two-point reduction for acceptance
3   of responsibility, which have been given by the probation
4   department, was inappropriate.  Consequently, at that time, I
5   initially calculated the total offense level and the other
6   guideline ranges as follows.

7           And for the record, let the record reflect that it
8   is my view, it was my view then and it is my view now, that
9   that is the appropriate guideline range.  That is a total
10  offense level of 21.  With a criminal history category of I.
11  Statutory provision as to Counts 1 and 2, not more than five
12  years.  The guideline provisions 37 to 46.  Statutory provision
13  as to probation as to Counts 1 and 2, one to five years.  The
14  guideline ineligible.  Statutory provision as to supervised
15  release as to Counts 1 and 2, not more than three years.  And
16  the guideline is two to three.  Statutory provision as to a
17  fine as to Counts 1 and 2, not more than $250,000.  And the
18  guideline provision $7,500 to $75,000.  Restitution is
19  inapplicable under both.  And a special assessment of $200
20  apply with respect to each.

21          By way of further background, thereafter, at the
22  previous sentence, I found that a five-level increase was
23  appropriate pursuant to Sentencing Guideline 2G2.2(b)(4), and I
24  incorporate by reference as is fully set forth my reasoning and
25  findings relative to that enhancement; found at pages 60

31

1   through 66 of the sentencing transcript.

2        Also, I increased the offense level by an additional
3   two points pursuant to United States Sentencing Guideline
4   3C1.1, dealing with obstruction of justice.
5        For the record, let me say that after careful
6   consideration that I believe that my findings upon which I
7   based a five-level enhancement were both factually and legally
8   accurate and remain so today.

9        With respect to the obstruction of justice, having
10  heard the additional testimony today, I've heard absolutely
11  nothing that changes my view, and that is that the two-point
12  enhancement for obstruction of justice was appropriate for the
13  reasons previously put forth on the record.
14        For the record, then, the final sentencing ranges
15  that I determined to be appropriate based upon the previously
16  described enhancements were a total offense level of 28; with a
17  criminal history category of I.  Statutory provision as to
18  custody as to Counts 1 and 2, not more than five years.  The
19  Guideline 78 to 97 months.  Statutory provision as to probation
20  as to Counts 1 and 2, one to five years.  Guideline ineligible.
21  Statutory provision as to supervised release as to Counts 1 and
22  2, not more than three years.  As to the Guidelines two to
23  three.  Statutory provision as to a fine as to Counts 1 and 2,
24  not more than $250,000.  The guideline provisions both $12,500
25  to $125,000.  Restitution being inapplicable under both the

32

1  statutory and the guideline provisions.  And a special
2  assessment of $200 applying with respect to both.
3        In the wake of the recent decision by the United
4  States Supreme Court in United_States_v._Booker, the Sentencing
5  Guidelines are, of course, as I mentioned earlier, now advisory
6  only.  However, I am still obligated to consult the Sentencing
7  Guidelines in determining the appropriate sentence.
8        In addition to the Sentencing Guidelines under
9  Booker, I must also consider the other factors set forth in
10  3553(a), which require courts to impose a sentence "sufficient,
11  but not greater than necessary" to comply with the purposes set
12  forth in paragraph two.  Section 3553(a)(2), states what those
13  purposes are:

14        (A)  to reflect the seriousness of the offense, to
15  promote respect for the law, and to provide just punishment for
16  the offense;

17        (B)  to afford adequate deterrence to criminal
18  conduct;

19        (C)  to protect the public from further crimes of
20  the defendant; and

21        (D)  to provide the defendant with needed
22  educational or vocational training, medical care, or other
23  correctional treatment in the most effective manner.
24        Section 3553(a) further directs the sentencing
25  courts to consider, (1) the nature and circumstances of the

33

1  offense, and the history and characteristics of the defendant;
2  the kinds of sentences available; the need to avoid unwanted
3  sentencing disparities among defendants with similar records
4  who have been found guilty of similar conduct; and the need to
5  provide restitution to any victims of the offense.
6         In fashioning this sentence here today at
7  resentencing, it is my obligation to carefully consider the
8  advisory guideline range, as well as the other factors which I
9  have just articulated, and I have done so.

10        Let me also say this if isn't clear for the record.
11  The advisory guideline range, which I find to be appropriate,
12  is the same guideline range which at that time was mandatory,
13  that is the 78 to 97 months, which I previously concluded to be
14  applicable at the earlier sentencing.

15        All right, Mr. Lucas, does your client want to say
16  something now?

17        MR. LUCAS:  He does, your Honor.
18        THE COURT:  Why doesn't he come up to that podium
19  right there.

20        THE DEFENDANT:  I'm a little nervous here, sir.
21        THE COURT:  Sir, try to speak into the microphone.
22        THE DEFENDANT:  I first want to thank you for the
23  opportunity to address you in court.  Sir, up to this point
24  there's been a lot said about me --

25        THE COURT:  You'll have to go a little slower for

34

1    the court reporter, don't speak too fast.

2         THE DEFENDANT:  I will not deny I made mistakes and
3    bad choices over this, as well as my life.  But I'm not the
4    animal like I'm made out to be and I'd like to show that now.
5    I'd also like you to know, sir, I've done a lot.  I've not
6    wasted the last three years I've been incarcerated.
7         I've done a lot, not only for myself, but for others
8    as well.  The first 18 months of my incarceration was spent in
9    the Erie County Prison.  Where I took a number of duties on
10   that nobody else would.  These duties included taking care of
11   inmates that could not take care of themselves.  From mental
12   health problems to physical problems.  Doing every aspect that
13   a nurse's aid would encounter, from cleaning up a person's
14   cell, to helping them with their diapers, as well as cleaning
15   up after that as well.  At the same time trying to allow that
16   person to keep their dignity in front of the other inmates that
17   could care less.  In fact, would rather make fun of them
18   because they soiled themselves or they could not fill out a
19   commissary list because they couldn't read or write to
20   correspond with friends or families back home.
21         Sir, I didn't do these things for the pay.  I didn't
22   do it because I liked it and I didn't do this to look good.  In
23   fact, I didn't get paid, and I really don't like doing this
24   type of work.  No matter how good you are at cleaning up
25   somebody else -- you can't look good, especially in front of

35

1  other inmates, all it does is make you a target.
2        Sir, I helped these people because I could not watch
3  them be exploited for their own care, these people have
4  dignity.  I didn't help them to impress anyone, either.  In
5  fact, I feel very ashamed to have to bring these issues up now.
6  I feel it cheapens what I did and why I did it.
7        I could only pray, though, I did help these people
8  because I now know and understand how it feels to have health
9  problems.  You see 8 to 12 months ago I was diagnosed, excuse
10  me, 8 to 12 months ago I started having trouble breathing after
11  short walks.  X-rays were taken, there were two spots found on
12  my left lung.  There have been two Cat scans done, but I've not
13  been informed of the results of the Cat scans or if these spots
14  on my left lung are still growing.  There has not been a biopsy
15  done, nor is one forthcoming.  I've been told the BOP does not
16  have the money to do this.  So I truly understand what these
17  people went through, I know the helplessness these people have
18  felt while being incarcerated and not having the proper medical
19  treatment.

20        Sir, also, I've taken a number of classes to help
21  better myself while I'm incarcerated.  I've taken a four month
22  in depth hydroponics class at FCI McKean.  I've taken a number
23  of OSHA classes that have allowed me to become OSHA certified
24  in a number of areas.  I've taken pre-release classes on such
25  issues of how to do a resume, how to fill out job application,

36

1   interviews, how to dress for success, basically, how to get a
2   job and how to keep a job as an inmate fresh out of prison.
3   I've taken a number of classes in Nova.  Which has a wide
4   variety of subjects allowing me to obtain adult education
5   credits.

6        I've worked hard and I'm proud of this.  I've done
7   all of this while keeping jobs that I've gotten for myself
8   while in the prison system, nobody had got this for me, I got
9   the jobs for myself and have had to work real hard at keeping
10   them.  As the letter my boss sent down from Devens, W.L. Brown,
11   will show.

12        So I've saved the most important issue, my sons
13   Steven and Christopher.  Contrary to what has been said so far,
14   my world is about my sons.  I've seen the pain from all this in
15   their eyes -- I heard the pain in their voices.  I wish I could
16   take that away, but I can't.  I had many sleepless nights over
17   that and bad dreams.  I understand the pain of not having a
18   father to reach out to.  I went through that myself.  I
19   understand it's going to be up to them if they want to have a
20   relationship with me later.  I also understand this doesn't
21   dismiss the responsibilities I have as a father to support my
22   sons.  That's just a responsibility that I refuse to shirk.
23   I've not been able to fulfill this in the last three years
24   because of my incarceration, the only ones suffering from that
25   is my sons.

37

1        So what I'm trying to say here is that I'm not this
2  animal that they've made me out to be in this courtroom.  I've
3  helped those people that I could.  Long before this ever
4  happened.  Anybody that I could help, I did.  But, as I said,
5  to dwell on this, keep a tally on everything would only cheapen
6  what I've done.  I just don't know how else to show the court
7  that I'm not the animal that I've been made out to be, that's
8  the only reason I bring it up.

9        Your Honor, I would also like to ask this court to
10  please take into consideration the path I've chosen while
11  incarcerated in a positive manner.  I've also chosen to stay
12  clear of trouble while incarcerated.  I've not lost any of my
13  good time.  I tried to do the right things while incarcerated.
14  I think sometimes people don't understand just how hard it is
15  to stay clear of trouble while incarcerated, I'm sure you've
16  heard of this and what is involved.

17        Sir, I'll give you my solemn word that if you give
18  me the opportunity to prove myself, you will never hear my name
19  in the criminal justice system again, I promise you that on
20  everything I love.  I, once again, want to thank you for the
21  opportunity to address you, your Honor, thank you.
22        THE COURT:  All right, Mr. Fowers.
23        MR. LUCAS:  If I may.  I had previously provided the
24  U.S. Attorney's Office, judge, I maybe should have done this
25  when he was on the stand, it's corroborating at least in part

38

1   Mr. Fowers' testimony, I have a brief letter written by W.L.
2   Brown, Acting Safety Manager, from the United States Department
3   of Justice, Federal Bureau of Prisons, that corroborates in
4   part Mr. Fowers' statement to the court about the positive
5   things that he has done.  I'm not sure if it was addressed
6   directly to the court as well.

7       THE COURT:  I'll take it.

8       MR. LUCAS:  It's brief, your Honor, but it at least
9   indicates that Mr. Fowers' statements to the court as to those
10   things he's done since he has been incarcerated, particularly,
11   with regard to employment, and with regard to other inmates, is
12   accurate.

13       THE COURT:  Do you want to make that part of the
14   sentencing record?

15       MR. LUCAS:  I would, your Honor.
16       THE COURT:  It is.  Is there anything you want to
17   say, Mr. Lucas?

18       MR. LUCAS:  Your Honor, obviously, I actually was
19   under the belief that the original base offense level would
20   give the court latitude, either the court already made those
21   findings as to the discretionary aspects of your conclusion and
22   not the automatic adding of the five-level increase.
23       THE COURT:  Put it this way, if you want to address
24   that, feel free to do it, in the vein of asking me to
25   reconsider those enhancements, if you want to.

39

1          MR. LUCAS:  I was about to, your Honor.
2          THE COURT:  All right, go ahead.
3          MR. LUCAS:  What I'm suggesting to the court is that
4   even based on the testimony that the court has heard and
5   recognizing that it is within the court's discretion, rather
6   than to automatically -- or to be mandatorily elevated by that
7   certain timeframe, there is nothing to mandate the court making
8   those same findings of fact.  Not quibbling with the court
9   about the findings of fact you made, but there is nothing that
10  says you would have to jump from a level 21 base offense level,
11  37 to 46 months, to a consideration that making the same
12  findings of fact that you made, jump to a 63 to 78 month
13  sentence.  And then further, based on the same findings of
14  fact, you made it a 78 to 97 month sentence.  I understand that
15  they are guidelines and they are discretionary.  What I'm
16  suggesting to the court is that, without arguing with the court
17  about your obvious discretion in terms of concluding what the
18  facts are, what I'm requesting that the court consider and what
19  I'm suggesting, for a variety of reasons, is that based on that
20  testimony, based on Mr. Fowers obvious health problems, in
21  light of where he is currently housed in the Federal Bureau of
22  Prisons, in light of his prison adjustment for the time that
23  he's been there, is the court not take up all of the time --
24          THE COURT:  Not to interrupt you, but as a practical
25  matter, if I found, as I did, that the advisory guideline range

40

1  is 78 to 97 months, that's an advisory guideline range?
2      MR. LUCAS:  It is, your Honor.

3      THE COURT:  You're suggesting that if I remain
4  convinced that enhancements were appropriate, and I do, that I
5  don't enhance as far as I did?

6      MR. LUCAS:  That's exactly right.
7      THE COURT:  All right, I understand your point.
8      MR. LUCAS:  And that is my point, that there is
9  plenty of time between what is the advisory base offense level
10  of 27 to 33 months, to an ultimate determination of 78 to 97
11  months, that's there's enough time there to still adequately
12  punish Mr. Fowers for those things that the court has found,
13  without necessarily assessing him the months that are advisory
14  now guideline range would suggest.  I'm asking that the court
15  strongly consider that and consider a sentence in the three to
16  five year range as being entirely appropriate, and not five to
17  seven years.

18      THE COURT:  All right.  Before we go on, it's not
19  clear to me what this fellow's diagnosis is?
20      MR. LUCAS:  Your Honor, he doesn't have one
21  currently, unfortunately.  I don't want to testify, judge --
22      THE COURT:  Go ahead.

23      MR. LUCAS:  He's been through, what the Federal
24  Bureau of Prisons have done so far, as the court will recall
25  the last scheduled sentencing hearing it was delayed because he

41

1  was not permitted to travel because of ongoing tests.  He tells
2  me that they did some testing, that there is still some testing
3  still to do, and they do not have a diagnosis, other than the
4  fact that it has something to do with a spot on his lungs.
5        THE COURT:  All right, Mr. Trabold.
6        MR. TRABOLD:  Your Honor, you've had the benefit of
7  multiple hearings in this case, both today's hearing and the
8  previous hearings, that we seemed to have a number of hearings
9  on prior to today.  And what strikes me about this case are
10  several different things.

11        First of all, the two sections that you found
12  justify an upward departure in this case, the pattern of sexual
13  activity or sexual exploitation of a minor, and obstruction of
14  justice, are two of the most egregious upward departure bases
15  in the guidelines.  And you found that both of them apply in
16  this case.

17        And in this particular case, the obstruction of
18  justice that you found Mr. Fowers has engaged in is, in my
19  view, one of the most egregious forms of obstruction of justice
20  you could ever engage in.

21        On the flip side of that, you're asked to somehow
22  lower Mr. Fowers's sentence on the basis of some mitigating
23  evidence.  However, the problem I have with that is Mr. Fowers
24  obviously has little to no remorse for his conduct in this
25  case, appears to have actually convinced himself, despite the

42

1  fact that he pled guilty and confessed to the FBI, that he did
2  not engage in the conduct that we're here on today.
3        So I ask you to consider all of that when you
4  sentence Mr. Fowers.  There's absolutely no reason in this case
5  to lower Mr. Fowers's sentence from the sentence that you
6  imposed before because, obviously, he's displayed to you today
7  the belief that he's not even guilty of the crime that he pled
8  guilty to.

9        I would also just like to rehash just very slightly
10  the conduct that makes up the obstruction of justice increase
11  in the advisory guidelines.  In this case the government
12  presented evidence at the previous sentence hearing that Cody
13  Fowers was interviewed by the Huntsville, Alabama Police
14  Department, and revealed in very clear, very stark terms,
15  without any hesitation, that his father put him up to taking
16  responsibility for the child pornography that was on this
17  defendant's computer.  And provided him specific details of
18  about what to tell the police should he be interviewed.  That
19  is conduct that is utterly reprehensible.  And Mr. Fowers has
20  presented nothing here today which in any way mitigates that.
21  And I ask for those reasons you sentence him to the same
22  sentence that you sentenced him to previously.  Thank you.
23        THE COURT:  All right, returning then to the
24  sentencing aspect.  As I said, I have carefully considered the
25  advisory guideline range, as well as the other factors which I

43

1  articulated.  Specifically, it was my view and it remains my
2  view that this is a very serious offense.  In a case such as
3  this, given these facts and the background, deterrence is a
4  very important aspect.  The protection of the public, in
5  particular children, is of paramount concern.  I've also
6  considered the history and characteristics of this defendant
7  and his conduct in connection with this case; including a
8  documented history of crimes against children.
9        And I will say for the record, that my experience
10  with Mr. Fowers has been and I find him to be one of the most
11  manipulative, deceptive and dangerous individuals that I have
12  run across.

13        Having carefully considered all these factors, I
14  believe that my original sentence was appropriate to address
15  the various sentencing concerns and factors that I delineated
16  above.  Mr. Fowers, would you stand up, please.
17        Pursuant to the Sentencing Reform Act of 1984, it is
18  the judgment of the court that the defendant, James Fowers, is
19  hereby committed to the custody of the Bureau of Prisons to be
20  imprisoned for a term of 85 months.  Consisting of 60 months at
21  Count 1, and 25 months at Count 2.  Count 2 is to be served
22  consecutive to Count 1.

23        Upon release from imprisonment, the defendant shall
24  be placed on supervised release for a term of three years, at
25  each of Counts 1 and 2, with said counts to run concurrently.

44

1    Within 72 hours of release from the custody of the
2    Bureau of Prisons, the defendant shall report in person to the
3    Probation Office in the district to which this defendant is
4    released.

5    While on supervised release, the defendant shall not
6    commit another federal, state or local crime, shall comply with
7    the standard conditions of supervision recommended by the
8    Sentencing Commission and adopted by this court.  And shall
9    comply with the following additional conditions:
10    The defendant shall not illegally possess a
11    controlled substance.

12    The defendant shall not possess a firearm or
13    destructive device.

14    The defendant shall participate in a program of
15    testing and, if necessary, treatment for substance abuse as
16    directed by the probation officer, until such time as the
17    defendant is released from the program by the probation
18    officer.  Further, the defendant shall be required to
19    contribute to the cost of services for any such treatment in an
20    amount to be determined by the probation officer, but not to
21    exceed the actual cost.

22    The defendant shall submit to one drug urinalysis
23    within 15 days after being placed on supervision and at least
24    two periodic tests thereafter.

25    The defendant shall participate in a mental health

45

1    treatment program and/or sexual offender treatment program as
2    approved and directed by the probation officer.  The defendant
3    shall abide by all program rules, requirements, and conditions
4    of the sex offender treatment program, including submission to
5    polygraph testing to determine if he is in compliance with the
6    conditions of release.

7        In accordance with 18 U.S.C. Section 3583(d) and
8    4042(c)(4), the defendant shall report the address where he
9    will reside and any subsequent change of address to the
10   probation officer responsible for the defendant's supervision
11   and, further, that the defendant shall register as a convicted
12   sex offender in any state where he resides, is employed,
13   carries on a vocation, or is a student.

14       The defendant shall not have any unsupervised
15   contact with any person under the age of 18, except in the
16   presence of a responsible adult who is aware of the nature of
17   the defendant's background and current offense and who has been
18   approved in advance by the probation officer.
19       The defendant shall not possess any materials,
20   including pictures, photographs, books, writings, drawings,
21   videos or video games depicting and/or describing child
22   pornography, as defined at 18 U.S.C. 2256(8).
23       The defendant is prohibited from operating Internet
24   Web sites containing child pornographic materials.
25       The defendant shall use only those computers and

46

1  computer-related devices, screen user names, passwords, e-mail
2  accounts, and Internet service providers as approved by the
3  probation officer.  Computers and computer-related devices
4  include, but are not necessarily limited to, personal
5  computers, personal data assistants, Internet appliances,
6  electronic games and cellular telephones, as well as their
7  peripheral equipment that can access or can be modified to
8  access the Internet, electronic bulletin boards, other
9  computers or similar media.

10       The defendant shall cooperate in the collection of
11  DNA as directed by the probation officer.

12       It is further ordered that the defendant shall pay
13  to the United States a special assessment of $200, which shall
14  be paid to the U.S. District Court Clerk forthwith.
15       The court finds that the defendant does not have the
16  ability to pay a fine and, consequently, will waive a fine in
17  this case.  Does your client understand his appellate rights?
18       MR. LUCAS:  He does.

19       THE COURT:  Mr. Fowers, you have 10 days to file an
20  appeal, do you understand that?

21       THE DEFENDANT:  Yes.

22       THE COURT:  Anything else, Mr. Lucas?
23       MR. LUCAS:  No, your Honor.

24       THE COURT:  Anything from the government?
25       MR. TRABOLD:  No, your Honor.

47

1          THE COURT:  All right, we're in recess.

2

3          (Whereupon, at 2:30 p.m., the re-sentencing

4     proceedings were concluded.)

5

6                    - - -

7

8

9

10            C E R T I F I C A T E
              – – – – – – – – – – –

11

12

13

14     I, Ronald J. Bench, certify that the foregoing is a

15     correct transcript from the record of proceedings in the

16     above-entitled matter.

17

18

19

20     _____

21     Ronald J. Bench

22

23

24

25